# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>616 Shadybrook Lane, Apartment 211<br>Corona, California 92979 | )<br>)<br>)  Case No.<br>)  ED16-0015M<br>) |

FILED
CLERK, U.S. DISTRICT COURT

JAN 2 6 2016

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Central _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1962(d); 18 U.S.C. § 1955; 18 U.S.C. § 1956(h);<br>21 U.S.C. §§ 846 and 841 | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/S/

*Applicant's signature*

Jennifer Wolf, Special Agent, FBI

*Printed name and title*

Sworn to before me and signed in my presence.

Date: **JAN 2 6 2016**

City and state: Riverside, California

**SHERI PYM**

*Judge's signature*

Sheri Pym, U.S. Magistrate Judge

*Printed name and title*

AUSA: P. Kakkar for Benjamin Katz (619) 546-9604

## AFFIDAVIT

I, Jennifer Wolf, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.   I am a Special Agent ("SA") employed by the FBI, and have been so employed for over 8 years.  I am currently assigned to the San Diego Field Office, Border Corruption Task Force.  As a result of my training and experience as an FBI SA, I am familiar with both federal and state laws.  My primary duties include the enforcement of federal criminal laws.  I have conducted and participated in investigations involving the possession and distribution of illegal narcotics, civil rights violations, human trafficking, and economic espionage.

### II. PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of an application for a search warrant for 616 Shadybrook Lane, Apartment 211, Corona, California 92979 (hereinafter referred to as "Target Location"), currently leased by Marilyn VILLAREAL ("VILLAREAL"), who was recently indicted for illegal gambling business and money laundering in the Southern District of California and has laundered proceeds for a drug dealer.

3.   The facts set forth in this affidavit are based upon conversations I have had with other law enforcement officers, a review of reports and written summaries generated by other law enforcement officers, and my training and experience.  This affidavit is being submitted for the limited purpose of

Instrumentality Protocol

1

establishing probable cause for the issuance of the requested
search warrants.  As such, this affidavit does not contain all
of the facts and circumstances that I have learned during this
investigation.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

### III. <u>PREMISES TO BE SEARCHED</u>

4.    The    (**"Target Location"**) is described as follows:

a.    616 Shadybrook Lane, Unit 211, Corona, California
92879, an apartment within a multi-unit apartment complex known
as the Marquessa Apartments, located on the northeast corner of
McKinley Street and Promenade Avenue.  The apartment complex
consists of multiple residential buildings, detached garage
buildings, and open parking slots throughout the complex.
Building 616 is a three-story building on the east side of the
complex and consists of brown and tan stucco, a tile roof, and
the numbers "616" are affixed with large black numbers to the
sides of the building.  The building consists of multiple
apartment units, one of which is apartment 211.  Apartment 211
is on the west side of building 616, on the second level, with
an exterior door facing west.  The door is brown in color with
two small glass panes near the top with a gold door knocker
affixed to the center of the door.  To the right of the door is
a black sign with white letters and numbers that reads
"Marquessa 616 211" (211 is printed below 616 and is much larger
than 616).  At the base of the stairs leading up to apartment

Instrumentality Protocol

2

211 is a separate black sign with white numbers that reads
"211". A white spherical light is affixed to stucco wall to the
left of the door.

      b.    The **Target Location** also includes the garage
associated with apartment 211, garage number 431. Garage 431 is
a detached non-residential building from building 616 described
above and is located to the immediate east of building 616,
separated by Shadybrook Lane. The garage building has a brown
and tan stucco finish with a tile roof and consists of multiple
single car garage doors. Garage 431 has a brown single car
garage door that faces west. A black placard is affixed
directly above the door with white numbers that reads "431".

### IV. STATEMENT OF PROBABLE CAUSE

   A.    **Owen Hanson's Gambling, Drug Distribution, and Money
         Laundering Organization**

      5.    I have spoken with the agents involved, and read their
written reports, and have learned the following:

      6.    Owen HANSON, aka "O-Owen HANSON," aka "0-Dog"
("HANSON") runs an illegal bookmaking organization under the
names "Rockstarbets" and "BetOdog," according to multiple
sources. HANSON came to the attention of the FBI after the June
2013 arrests of multiple members of the MACHO SPORTS illegal
gambling operation that resulted in the seizure of millions of
dollars in assets and 18 individual defendants in United States
v. Jan Harald Portocarrero, et al., case number 13CR2196-JLS
(U.S. District Court for the Southern District of California).

Instrumentality Protocol

7.    HANSON's organization also distributes narcotics both domestically and internationally.  On September 9, 2015, HANSON was arrested after he arranged for five kilograms of cocaine and five kilograms of methamphetamine to be delivered to undercover agents in San Diego.  During several recorded meetings with the undercover agents, HANSON provided operational details of his drug organization.  HANSON explained that his organization used an established trucking business to transport narcotics throughout North America.  HANSON also claimed that his organization trafficked drugs into and out of Panama, Costa Rica, Mexico, Australia, Italy, and the United States.

8.    HANSON's illegal bookmaking organization is comprised of associates and customers throughout the United States and abroad.  Hanson is the leader and organizer of the enterprise, and he delegated operational duties to Kenny HILINSKI, an expatriate living in Peru.  HILINSKI is responsible for running the day-to-day operations of the gambling business by coordinating bookies, maintaining the organization's websites, and tracking the organization's payouts and revenue.

9.    To accomplish this, HILINSKI is assisted by several "runners" in the San Diego and Los Angeles areas.  Runners, at HILINSKI's direction, pick up the proceeds of the bookmaking business (gamblers' losses) from gamblers and bookies, and make deposits in various bank accounts of the organization and/or its associates.  HILINSKI keeps a running "pay-in/pay-out" sheet for each of the organization's runners and bookies to track how much

Instrumentality Protocol

money is receivable from, owed to, or held by the relevant
runner or bookie.  HILINSKI typically emailed a PDF of the sheet
to the relevant individual on a weekly basis.

10.  On January 12, 2016, a grand jury in the Southern
District of California returned a sealed four-count indictment
charging 23 defendants in connection with HANSON's organization.
The counts were: (1) Racketeering Conspiracy to Conduct
Enterprise Affairs (7 defendants) [18 U.S.C. §§ 1962(d)]; (2)
Illegal Gambling Business (21 defendants) [18 U.S.C. § 1955];
Money Laundering Conspiracy [18 U.S.C. § 1956(h)] (9
defendants); and (3) Conspiracy to Distribute Narcotics [21
U.S.C. §§ 846, 841] (3 defendants) (collectively, the "Target
Offenses").  VILLAREAL, a runner for HANSON's organization, is
charged with both Illegal Gambling Business and Money Laundering
Conspiracy.

**B.   VILLAREAL's Role Within HANSON's Organization**

11.  I have spoken with the agents involved, and read their
written reports, and have learned the following:

12.  VILLAREAL is a runner in HANSON's organization.  As a
runner, VILLAREAL was responsible for picking up money from
other members of the organization and depositing it into various
accounts at HILINSKI's direction.  These accounts included those
of the organization as well as those of winning gamblers or
their bookies.

13.  On March 25, 2015, U.S. Magistrate Judge David Bartick
of the Southern District of California issued a search warrant

Instrumentality Protocol

5

for VILLAREAL's email address, marlenemv02@hotmail.com.  A
review of the documents produced pursuant to this warrant
established that between May 2014 and December 2014, VILLAREAL
exchanged more than 1,200 emails with HILINSKI.  The vast
majority of these emails consisted of HILINSKI providing bank
account information and a dollar amount.  VILLAREAL would then
typically respond with an email saying "Done."  In some cases,
VILLAREAL would attach deposit receipts confirming that the
relevant deposits were made.  Agents also reviewed bank records
of bookies working for the HANSON organization and confirmed
that corresponding deposits were made consistent with these
email exchanges.

    14.  VILLAREAL also, on occasion, took direction from
HANSON to send or receive money from members of his organization
involved in narcotic trafficking.  For example, on October 7,
2014, VILLAREAL informed HILINSKI via email that she deposited
$2,500 into the account of Derek LOVILLE via an out-of-state
counter deposit.  LOVILLE is a drug dealer for HANSON's
organization.  An entry on the pay-in/pay-out sheet that
HILINSKI sent VILLAREAL on October 26, 2014, also includes a
"pay-out" entry dated October 7 that lists $2,500 to LOVILLE.
This entry is one of more than 150 entries on that week's sheet.

    15.  VILLAREAL also assisted HANSON with day-to-day tasks,
as evidenced by her email communications with HANSON and
HILINSKI.  For example, VILLAREAL booked travel for HANSON, paid
HANSON's bills, and coordinated his schedule.

                              Instrumentality Protocol

                 6

16.   The footer lines of VILLAREAL's email establish that she frequently was receiving and sending the email communications described about on an iPhone device.

17.   In addition, in late 2013 FBI agents identified a confidential source ("CS-1")[1] who was a former member of HANSON's criminal organization, who provided corroborating information about HANSON's bookmaking and money laundering activities. According to CS-1, CS-1 worked in HANSON's bookmaking organization from approximately 2009 until 2011, and CS-1 left the organization due to concerns about HANSON's possible involvement in more serious drug trafficking activities in Mexico.  However, CS-1 stated that CS-1 has remained in contact with HANSON and knows that HANSON is still running his illegal gambling business.

18.   At the direction of FBI agents, in February and March 2014, CS-1 contacted HANSON by consensually recorded telephone call to begin working again as a "runner" in HANSON's illegal gambling business.  HANSON agreed, but said they would need to meet in person to discuss the details.  The in-person meeting did not take place, but HANSON and CS-1 engaged in an email exchange, wherein HANSON instructed CS-1 to set up multiple accounts for HANSON's use in laundering the proceeds of his illegal gambling business.  At the direction of the FBI, CS-1

---

[1] CS-1 has no known prior criminal record. CS-1 has not expressed an interest in financial compensation for CS-1's cooperation. CS-1 has said that CS-1 felt "used" by HANSON, because HANSON claimed the organization's bookmaking activities were legal.

Instrumentality Protocol

7

set up those accounts. CS-1 then used those accounts to launder over $40,000 at the direction of HANSON (and HANSON's associates).

19.   At the direction of HANSON, CS-1 made multiple deliveries of those "laundered" funds to VILLAREAL, including:

a.   Delivering $18,800 in gambling proceeds to VILLAREAL on September 26, 2014;

b.   Delivering $28,000 in gambling proceeds to VILLAREAL on February 27, 2015;

c.   Delivering $19,400 in gambling proceeds to VILLAREAL on April 22, 2015;

d.   Delivering $11,000 in gambling proceeds to VILLAREAL on June 12, 2015; and

e.   Delivering $3,725 in gambling proceeds to VILLAREAL on September 23, 2015.[2]

20.   Agents conducted surveillance on VILLAREAL after she received the gambling proceeds on April 22, 2015, and she was observed returning to the Target Location.

C.   **VILLAREAL'S Contact with HANSON Following HANSON's Arrest**

21.   Following HANSON's arrest, he communicated with an associate, Giovanni BRANDOLINO via a recorded jail call.  HANSON instructed BRANDOLINO to tell "Kenny [HILINSKI] and Marlyn [VILLAREAL] business as usual.  Boss's orders."  I believe that this conversation was a clear reference to the gambling

---

[2] An undercover agent accompanied CS-1 with respect to this delivery.

operation, and as such, believe that VILLAREAL continues to operate HANSON's gambling operation today.

22. On September 22, 2015, VILLAREAL visited HANSON at the jail he was being held at. This visit was recorded. During the visit, HANSON asked VILLARAL if his office was cleaned out and asked whether "those pictures" had been thrown away. VILLAREAL responded that she had put the pictures in her trunk. HANSON then gave VILLAREAL instructions to contact HILINSKI about collecting outstanding debts on HANSON's behalf. Based on my training and experience, I believe that these conversations related to HANSON's criminal organization and the money connected to it.

**D. There is Probable Cause to Believe that Evidence Will Be Found at The Target Location**

23. There is probable cause to believe that evidence, fruits, and instrumentalities of criminal conduct will be found at the **Target Location** as set forth below.

24. As noted above, on April 22, 2015, agents followed VILLAREAL from the location of the $19,400 delivery to the **Target Location**.

25. I have been informed that on January 21, 2016, the management company informed agents that VILLAREAL is the current lessee of the **Target Location**. In addition, FBI Special Agent Kevin Boles has informed me that he spoke with the apartment manager of the **Target Location** and the apartment manager confirmed a photograph of VILLAREAL and said that she was living at the **Target Location** as of January 21, 2016 and drove a white

Instrumentality Protocol

Lexus and that garage 431 is associated with the **Target Location**.

## V. <u>TRAINING AND EXPERIENCE</u>

26.   Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics, money laundering, financial, racketeering, gambling, and all the facts and opinions set forth in this affidavit, I know the following:

a.   Individuals involved in narcotics trafficking, illegal bookmaking and money laundering from narcotics trafficking and gambling often maintain documentation evidencing such criminal activity at their residences and in their own vehicles.  At times, the narcotics may be sold or the gambling losses collected, but documentary records and ledgers often remain for long periods of time to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and contact information of suppliers, customers, gamblers, and co-conspirators.  These records are not only maintained in paper form, but also on computer data in the form of computer hardware and software, telephonic devices, and other communication devices.

b.   Individuals involved in narcotics trafficking, illegal bookmaking, and money laundering from narcotics trafficking and illegal bookmaking will often maintain documentation evidencing of such criminal activity at their residences and vehicles, as well as in the residences and

Instrumentality Protocol

vehicles of their associates, place of business, and/or rental storage for long periods of time to memorialize past transactions client lists, pay/owe sheets and ledgers, runner logs, transaction logs, names and contacts of co-conspirators, the status of accounts receivable and accounts payable. These records are not only maintained in paper form, but also as computer data in the form of computer hardware and software, telephonic devices, and other communication devices.

c.    Individuals involved in narcotics trafficking and illegal bookmaking (and money laundering necessitated by the large volume of cash generated by drug trafficking and illegal bookmaking) often use cellular telephones and electronic communication to direct the narcotics trafficking, gambling, and money laundering with co-conspirators to direct or be directed involving all activities associated with their schemes.

d.    The above-described documents are often permanently possessed by drug dealers/manufacturers and bookmakers much the same way a legitimate business maintains records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents are kept by drug dealers/manufacturers and bookmakers whether or not the dealer/manufacturer is in possession of any drugs/chemicals at any given moment. I believe that the seizure of such documents will provide evidence of the events set forth in this affidavit and that such documents can be found in the

Instrumentality Protocol

**Target Location** despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

## VI. TRAINING AND EXPERINCE ON DIGITAL DEVICES

27. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital

Instrumentality Protocol

devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x

Instrumentality Protocol

35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

        d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on

Instrumentality Protocol

when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.   Recovery also can require substantial time.

      e.    Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.   Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.   Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).   Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.   Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.   Operating

Instrumentality Protocol

15

systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g.    When searching the **Target Location**, it is likely that Apple brand devices, such as iPad or iPhones, will be found

Instrumentality Protocol

16

because VILLAREAL's e-mail signature block frequently includes the note that her emails were sent from her iPhone. I know from my training and experience and my review of publicly available materials published by Apple that those Apple devices can enable what is referred to as "Touch ID," a feature that recognizes up to five fingerprints designated by the authorized user of the iPhone. A Touch ID sensor, a round button on the iPhone or iPad, can recognize fingerprints. The fingerprints authorized to access the particular device are a part of the security settings of the device and will allow access to the device in lieu of entering a numerical passcode or longer alpha-numerical password, whichever the device is configured by the user to require. The Touch ID feature only permits up to five attempts with a fingerprint before the device will require the user to enter a passcode. Furthermore, the Touch ID feature will not substitute for the use of a passcode or password if more than 48 hours have passed since the device has been unlocked; in other words, if more than 48 hours have passed since the device was accessed, the device will require the passcode or password programmed by the user and will not allow access to the device based on a fingerprint alone. Similarly, Touch ID will not allow access if the device has been turned on or restarted, if the device has received a remote lock command, or if five attempts to match a fingerprint have been unsuccessful. For these reasons, it is necessary to use the fingerprints and thumbprints of any device's users to attempt to gain access to

Instrumentality Protocol

any Apple devices found at the Subject Premises while executing the search warrant. The government may not be able to obtain the contents of the Apple devices if those fingerprints are not used to access the Apple devices by depressing them against the Touch ID button. Although I do not know which of the ten finger or fingers are authorized to access on any given Apple device and only five attempts are permitted, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for Touch ID, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

28. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by any other means.

## VII. ITEMS TO BE SEIZED

29. Based on the foregoing, I respectfully submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence of violations of 18 U.S.C. § 1962(d), Racketeering Conspiracy to Conduct Enterprise Affairs; 18 U.S.C. § 1955, Illegal Gambling Business; 18 U.S.C. § 1956(h), Money Laundering Conspiracy; and 21 U.S.C. §§ 846 and 841, Conspiracy to Distribute Narcotics, will be found at the **Target Location.**

///

///

Instrumentality Protocol

## VIII.     CONCLUSION

30.   For all the reasons described above, there is probable cause to believe that evidence of violations of the Target Offenses, as described in Attachment B of this affidavit, will be found in searches of the **Target Location**, as further described in Attachment A of this affidavit.

/S/

_____
Jennifer Wolf, Special Agent,
Federal Bureau of
Investigation

Subscribed to and sworn before me
this 26th day of January, 2016.

SHERI PYM
_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE

19

Instrumentality Protocol

## ATTACHMENT A

<u>PREMISES TO BE SEARCHED</u>

616 Shadybrook Lane, Unit 211, Corona, California 92879, is an apartment located within a multi-unit apartment complex known as the Marquessa Apartments, located on the northeast corner of McKinley Street and Promenade Avenue.  The apartment complex consists of multiple residential buildings, detached garage buildings, and open parking slots throughout the complex.  Building 616 is a three-story building on the east side of the complex and consists of brown and tan stucco, a tile roof, and the numbers "616" are affixed with large black numbers to the sides of the building.  The building consists of multiple apartment units, one of which is apartment 211.  Apartment 211 is on the west side of building 616, on the second level, with an exterior door facing west.  The door is brown in color with two small glass panes near the top with a gold door knocker affixed to the center of the door.  To the right of the door is a black sign with white letters and numbers that reads "Marquessa 616 211" (211 is printed below 616 and is much larger than 616).  At the base of the stairs leading up to apartment 211 is a separate black sign with white numbers that reads "211".  A white spherical light is affixed to stucco wall to the left of the door.

The premises to be searched also includes the garage associated with apartment 211, garage number 431.  Garage 431 is a detached non-residential building from building 616 described above and is located to the immediate east of building 616,

Instrumentality Protocol

i

separated by Shadybrook Lane.  The garage building has a brown and tan stucco finish with a tile roof and consists of multiple single car garage doors.  Garage 431 has a brown single car garage door that faces west.  A black placard is affixed directly above the door with white numbers that reads "431".

Instrumentality Protocol

**ATTACHMENT B**

ITEMS TO BE SEIZED

1.    The items to be seized are evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1962(d), Racketeering Conspiracy to Conduct Enterprise Affairs; 18 U.S.C. § 1955, Illegal Gambling Business; 18 U.S.C. § 1956(h), Money Laundering Conspiracy; and 21 U.S.C. §§ 846 and 841, Conspiracy to Distribute Narcotics, namely:

a.    Records, documents, programs, applications, materials, and materials or articles of personal property concerning illegal gambling, distribution of controlled substances, or money laundering, including buyer or client lists, seller or bookie lists, pay/owe sheets, records of sales, deposits, or credits, log books, ledgers, telephone answering pads, bank and financial records, storage records such as storage locker receipts, safe deposit box rental records, precious metals, jewelry, written correspondence, videotape recordings, photographs and/or drawings related to these activities;

b.    Currency in amounts exceeding $1,000;

c.    Records, documents, programs, applications, or materials and articles of personal property concerning the identity of the persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility and telephone bills and receipts, photographs, answering machine tape

Instrumentality Protocol

i

recordings, telephone beeper or paging devices, rolodexes, telephone/communication devices answering pads, storage records, vehicle and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax returns, bang records, safe deposit records, canceled checks, and other records of income and expenditure, credit card and bank records, travel documents, personal identification documents, and documents concerning obtaining false identification, including birth certificates, driver's license, immigration cards, and other forms of identification in which the same person would use other names and identities other than his/her own, not to exceed fifteen items for the premises;

d.   Any digital device used to facilitate the above-listed violations and forensic copies thereof.

e.   With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   Evidence of who used, owned, or controlled the device at the   time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   Evidence of the presence or absence of software that would allow others to control the device, such as

Instrumentality Protocol

ii

viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   iii. evidence of the attachment of other devices;

   iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

   v. evidence of the times the device was used;

   vi. passwords, encryption keys, and other access devices that may be necessary to access the device; applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

   vii. records of or information about Internet Protocol addresses used by the device;

   viii. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

   ix. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

            Instrumentality Protocol

2.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as moderns, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

**SEARCH PROCEDURE FOR DIGITAL DEVICES**

3.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 60 days from the date of execution of the warrant.  If additional time is needed, the government may seek an extension of this time period from the

Instrumentality Protocol

iv

Court on or before the date by which the search was to have been completed.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

c.   When searching a digital device pursuant to the specific search protocols selected, the search team shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

d.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime

Instrumentality Protocol

v

was encountered, including how it was immediately apparent contraband or evidence of a crime.

      e.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      f.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      g.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access them (after the time for searching the device has expired) absent further court order.

      h.   The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

Instrumentality Protocol

vi

i.    Notwithstanding the above, after the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

a.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

Instrumentality Protocol

vii

5.     During the execution of this search warrant at the Subject Premises, the law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of persons at the Subject Premises onto the Touch ID sensor of any Apple iPhone, iPad, or other Apple brand device in order to gain access to the contents of any such device.

6.     The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

Instrumentality Protocol